UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 23-8620-KK-RAOx** | Date: | December 19, 2023 |
|---|---|---|---|
| Title: | *Aziel Joey Gomez Perez v. Qantas Airways Limited, et al.* | | |

Present: The Honorable   KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| Noe Ponce | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **(In Chambers) Order DENYING Plaintiff's Motion to Remand [Dkt. 12]**

I.
**INTRODUCTION**

On August 9, 2023, Plaintiff Aziel Joey Gomez Perez ("Plaintiff") filed a Class Action Complaint in the Superior Court of California, County of Los Angeles. ECF Docket No. ("Dkt.") 1-1. On October 12, 2023, Defendant Qantas Airways Limited ("Defendant") filed a Notice of Removal of Action to Federal Court pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453. Dkt. 1. On November 13, 2023, Plaintiff filed a Motion to Remand to the Superior Court of California, County of Los Angeles. Dkt. 12. On November 20, 2023, Defendant filed an Opposition to the Motion to Remand. Dkt. 18. On November 27, 2023, Plaintiff filed a Reply. Dkt. 20.

The Court finds this matter appropriate for resolution without oral argument. See FED. R. CIV. P. 78(b); L.R. 7-15. For the reasons stated below, Plaintiff's Motion to Remand is DENIED.

II.
**PROCEDURAL HISTORY**

On August 9, 2023, Plaintiff, a citizen of California, filed a Class Action Complaint in the Superior Court of California, County of Los Angeles ("Complaint"). Dkt. 1-1. The Complaint alleges putative class claims on behalf of non-exempt Qantas California employees ("Class Members") against Defendant under the California Labor Code and the California Industrial Wage Commission Wage Orders for (1) recovery of unpaid minimum wages; (2) recovery of unpaid

overtime wages; (3) failure to provide compliant meal periods; (4) failure to provide compliant rest periods; (5) failure to timely pay all wages upon termination; and (6) failure to reimburse business expenses. Id. ¶¶ 90-132. Plaintiff also asserts a putative class claim for unfair business practices under California's Unfair Competition Law. Id. ¶¶ 133-137. Plaintiff alleges the violations began around February 18, 2019, and continued until October 12, 2023 when the Complaint was filed (the "Class Period"). Id. ¶ 17.

Plaintiff alleges employees (1) were not paid for all hours worked, resulting in the underpayment of minimum and overtime wages because of Defendant's "automatic deduction and time rounding policies," id. ¶ 18; (2) "were consistently unable to take timely, off duty, thirty-minute, uninterrupted meal periods, often being forced to take late meal periods, interrupted meal periods, and/or work through part or all their meal periods due to understaffing, the nature and constraints of their job duties and/or commentary from supervisors pressuring them to take non-compliant meal periods or skip meal periods completely," id. ¶ 45; (3) did not receive legally compliant rest periods, id. ¶ 60; (4) upon separation of employment, were not provided timely final paychecks and/or were not timely provided with all owed vacation pay, paid time off, and/or all wages owed, id. ¶ 73; and (5) were forced to incur business expenses as a direct consequence of the performance of their job duties without receiving reimbursement, id. ¶ 77.

On October 12, 2023, Defendant filed a Notice of Removal ("Notice") under the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d); dkt. 1 at 2. In its Notice, Defendant alleges removal was proper because "this is a civil action between citizens of different states, where the amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and the putative class has more than 100 members." Id. Defendant included a Declaration by Jessykah Flower, a Senior Manager at Qantas Airways Limited ("Qantas") in support of its Notice. Dkts. 1-15, 12-9.

On November 13, 2023, Plaintiff filed a Motion to Remand the action back to Los Angeles County Superior Court ("Motion"). Dkt. 12. Plaintiff argues Defendant fails to establish minimal diversity because (1) Defendant and Plaintiff are both citizens of California; and (2) Defendant's Amount in Controversy is "based on conclusory assertions, assumptions, and speculation that fail to show the statutory minimum by a preponderance of the evidence." Id. at 6-7.

On November 20, 2023, Defendant filed an Opposition to Plaintiff's Motion arguing it has satisfied its burden to establish removal is proper ("Opposition"). Dkt. 18. Defendant filed a second updated Declaration from Jessykah Flower in support of its Opposition. Dkt. 18-1. On November 27, 2023, Plaintiff filed a Reply ("Reply"). Dkt. 20. The matter thus stands submitted.

### III.
### DISCUSSION

CAFA vests federal courts with original diversity jurisdiction over class actions where: (1) there are at least 100 class members; (2) any class member is a citizen of a state different from any defendant; and (3) the aggregate amount in controversy exceeds $5,000,000. Brinkley v. Monterey Fin. Servs., Inc., 873 F.3d 1118, 1121 (9th Cir. 2017) (citing 28 U.S.C. § 1332(d)(2), (5)(B)). "Congress designed the terms of CAFA specifically to permit a defendant to remove certain class or

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk NP

mass actions into federal court." Ibarra v. Manheim Invs., Inc., 775 F.3d 1193, 1197 (9th Cir. 2015) (citing 28 U.S.C. § 1332(d)). The statute was designed "to be interpreted expansively." Id. (citing S. Rep. No. 109-14, at 42 (Feb. 28, 2005)); see also Jauregui v. Roadrunner Transp. Servs., Inc., 28 F.4th 989, 992-93 (9th Cir. 2022) (quoting Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 89 (2014)) ("CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant."). Thus, while "a presumption against federal jurisdiction exists in the usual diversity case, no antiremoval presumption attends cases invoking CAFA." Greene v. Harley-Davidson, Inc., 965 F.3d 767, 772 (9th Cir. 2020).

Here, as discussed below, Defendant has met its burden to establish removal is proper because (1) there is minimal diversity between Plaintiff, a California citizen, and Defendant, a foreign corporation with its headquarters and principal place of business in Sydney, Australia; (2) the putative class is at least 100 members; and (3) the aggregate amount in controversy exceeds $5,000,000.

A.      **The Putative Class Size Is at Least 100 Members.**

There must be at least 100 class members to satisfy diversity jurisdiction under CAFA. Brinkley, 873 F.3d at 1121 (citing 28 U.S.C. § 1332(d)(2), (5)(B)). Allegations in a complaint that claim at least 100 class members are considered judicial admissions binding on a plaintiff. See Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.").

Here, Plaintiff does not dispute that the putative class is at least 100 members. Dkt. 12 at 10 n.1. Moreover, the allegations in the Complaint satisfy the numerosity requirement. Plaintiff alleges: "While the exact number of Class Member is unknown, the Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. PLAINTIFF is informed and believes the Class consists of at least 100 individuals." Dkt. 1-1 ¶ 15. Accordingly, there is sufficient evidence to conclude there are at least 100 class members.

B.      **Minimal Diversity Exists Between Plaintiff and Defendant.**

1.      **Applicable Law**

The federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). A corporation's "principal place of business" is its "nerve center" – it is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). "A corporation's 'nerve center' . . . is a single place." Id. at 93. It will "normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings[.]" Id.

### 2.    Relevant Facts

Jessykah Flower ("Ms. Flower") is employed as a Senior Manager for Defendant, with personal knowledge of Defendant's "corporate organization and operations, human resources information systems, and payroll and employment practices."  Dkts. 1-15 ¶ 1, 12-9 ¶ 1.  According to Ms. Flower, Defendant is a corporation organized under the laws of the Commonwealth of Australia, with its headquarters and principal place of business in Sydney, Australia.  Dkts. 1-15 ¶ 2, 12-9 ¶ 2.  Defendant's board of directors sits in Australia and "[r]egional leaders and vice presidents in the United States . . . report to and are supervised by senior managers, executives, and/or officers based at [Defendant's] corporate headquarters in Australia."  Dkt. 18-1 ¶¶ 4-5.

### 3.    Analysis

Here, minimal diversity exists because Defendant is a citizen of Australia and Plaintiff is a citizen of California.  Although Plaintiff argues the existence of Defendant's "designated 'U.S. head office' located in Los Angeles calls into question" Defendant's claim that its principal place of business is in Australia, this argument is unavailing.  Dkt. 12 at 13.  Defendant is organized under the laws of the Commonwealth of Australia, its global headquarters is located in Sydney, Australia, and its board of directors sits in Australia.  Dkts. 1-15 ¶ 2, 12-9 ¶ 2; dkt. 18-1 ¶¶ 4-5.  Moreover, while Defendant has "[r]egional leaders and vice presidents in the United States," they "report to and are supervised by senior managers, executives, and/or officers based at Qantas's corporate headquarters in Australia."  Dkt. 18-1 ¶ 5.

Thus, Australia is Defendant's "nerve center" – it is the "center of direction, control, and coordination."  Hertz Corp., 559 U.S. at 92-93.  It is "not simply an office where the corporation holds its board meetings[.]"  Id.; cf. Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) ("General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.  A corporation that operates in many places can scarcely be deemed at home in all of them.").  Accordingly, Defendant has established it is a citizen of Australia, and thus, minimal diversity exists because Defendant is a citizen of Australia, and Plaintiff is a citizen of California.

## C.    The Amount in Controversy Exceeds $5,000,000.

### 1.    Applicable Law

"To meet CAFA's amount-in-controversy requirement, a defendant needs to plausibly show that it is reasonably possible that the potential liability exceeds $5 million."  Greene v. Harley-Davidson, Inc., 965 F.3d 767, 772 (9th Cir. 2020).  When a plaintiff contests the amount in controversy, "'both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.'"  Jauregui, 28 F.4th at 992 (citing Dart Cherokee Basin Operating Co., LLC, 574 U.S. at 88).  "The preponderance standard does not require a district court to perform a detailed mathematical calculation of the amount in controversy before determining whether the defendant has satisfied its burden."  Harris v. KM Indus., Inc., 980 F.3d 694, 701 (9th Cir. 2020).

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." Id. (quoting Ibarra, 775 F.3d at 1198).  "[T]he removing party must be able to rely 'on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million,' as long as the reasoning and underlying assumptions are reasonable." Jauregui, 28 F.4th at 993 (citing LaCross v. Knight Transp. Inc., 775 F.3d 1200, 1201 (9th Cir. 2015)).  A court "should weigh the reasonableness of the removing party's assumptions, not supply further assumptions of its own." Harris, 980 F.3d at 701.  "After considering any evidence put forth by the parties, and assessing the reasonableness of the defendant's assumptions, 'the court then decides where the preponderance lies.'" Id. (quoting Ibarra, 775 F.3d at 1198).

"The parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." Ibarra, 775 F.3d at 1197 (internal quotations marks and citation omitted).  Courts have accepted "declarations from human resources professionals" that provide details including average hourly rates and total number of workweeks "as credible evidence to establish CAFA removal." Alvarez v. Off. Depot, Inc., No. CV-17-7220-PSG-AFMx, 2017 WL 5952181, at *2 (C.D. Cal. Nov. 30, 2017) (recognizing that other courts "have been more skeptical of" this evidence, but acknowledging that the Ninth Circuit has emphasized that CAFA is to be interpreted expansively); see also Feao v. UFP Riverside, LLC, No. CV 17-3080-PSG-PRx, 2017 WL 2836207, at *3 (C.D. Cal. June 29, 2017) (finding that defendant's "Director of Compensation and HR Systems," who "provide[d] statistics gleaned from [d]efendant's records, such as the number of putative class members, the putative class members' weighted average hourly wage, and the number of putative class members terminated during the relevant time period," was "competent to serve as a declarant in this matter"); Ruano v. Sears Roebuck & Co., No. CV 15-6060-PSG-FFMx, 2015 WL 6758130, at *4 (C.D. Cal. Nov. 5, 2015) ("A declaration from a person with knowledge of the relevant data is clearly an appropriate form of evidence.").

### 2.    Relevant Facts

Defendant provides two declarations from Ms. Flower in support of removal: the first on October 11, 2023 ("Declaration"), and the second supplement on November 20, 2023 ("Supplemental Declaration").  The declarations detail, inter alia, the number of non-exempt, California employees employed by Defendant within the last three years, the average wage rate paid per hour, and the number of non-exempt California employees working on a 4-day/10-hour Alternative Work Schedule ("AWS").  Dkts. 1-15, 12-9, 18-1.  In preparing her declarations, Ms. Flower reviewed "payroll, timekeeping, and human resources/personnel records for non-exempt employees in the State of California, which were created and maintained in the regular course of business, and data analytics derived therefrom" to make her conclusions.  Dkts. 1-15 ¶¶ 4-5; 12-9 ¶¶ 4-5; dkt. 18-1 ¶ 7.

According to Ms. Flower, between June 1, 2020 and April 14/15, 2023, Defendant employed 266 non-exempt employees in California.  Dkt. 18-1 ¶ 7.  The estimated average wage rate ("Average Hourly Wage") paid to non-exempt California employees was $36.29 per hour.  Dkts. 1-15 ¶ 4, 12-9 ¶ 4.  Plaintiff's wage rate within this time was $32.00 per hour.  Dkt. 12-7.  Of the 266 non-exempt

California employees, 198 employees worked on a 4-day/10-hour AWS. Dkt. 18-1 ¶ 7. Those individuals worked a total of approximately 54,684 days on this AWS. Id. The estimated median daily shift length on this AWS was 10 hours. Id. With respect to all 266 non-exempt employees, there were 72,223 days with work-shifts that were five hours or more in length. Dkt. 18-1 ¶ 8. Finally, between June 1, 2020 and April 15, 2023, 139 non-exempt California employees separated from the company. Id. ¶ 9. Of those 139 employees, 95 employees worked on a 4-day/10-hour AWS, and 44 employees worked on a regular, non-AWS schedule. Id.

///

### 3.    Analysis

As an initial matter, the Court finds the declarations of Ms. Flower to be competent evidence in support of Defendant's Amount in Controversy calculation. Dkts. 1-15, 12-9, 18-1. Both declarations demonstrate Ms. Flower reviewed relevant records and analytics in reaching her conclusions. See id. While Plaintiff raises general objections to Ms. Flower's conclusions, he provides no evidence to contradict her records, analytics, or conclusions. See dkt. 12 at 13-23. Rather, Plaintiff merely provides Plaintiff's wage statements from June 2020 to September 2021, which show his personal hourly wage rate at $32.00, to support his proposed Amount in Controversy calculation. Dkt. 12-7. Thus, the Court accepts Ms. Flower's declarations as "credible evidence to establish CAFA removal." Alvarez, 2017 WL 5952181, at *2.

In calculating their respective amounts in controversy, the parties rely on Ms. Flower's conclusions and focus on five general categories of violations: (1) unpaid minimum and overtime wages; (2) meal periods; (3) rest periods; (4) waiting time penalties; and (5) attorneys' fees. See dkts. 12, 18, 20. While both parties rely on data produced by Ms. Flower to calculate their respective Amount in Controversy estimates, they appear to disagree over the Average Hourly Wage and the violation rates to be applied in evaluating each of these five categories.[1]

As discussed below, considering both parties' estimates and preferred violation rates, the Court finds Defendant has met its burden to establish the Amount in Controversy exceeds $5,000,000.

### a.    Average Hourly Rate

With respect to the average hourly rate for the putative class members, Defendant relies on the calculations/estimations by Ms. Flower to conclude that the Average Hourly Wage paid to "non-exempt Qantas employees in the State of California" is $36.29. Dkts. 1-15 ¶ 4, 12-9 ¶ 4. Plaintiff

---

[1] In his Motion, Plaintiff also argues Defendant's "estimated class size is conclusory." Dkt. 12 at 17. In Ms. Flower's Supplemental Declaration included with Defendant's Opposition, she determined there were 266 non-exempt California employees employed by Defendant from June 2020 to April 2023. Dkt. 18-1 ¶ 7. Plaintiff does not appear to object to this total, or provide any evidence to the contrary. See dkt. 20 at 10 n.1. Rather, Plaintiff merely states he "does not dispute for purposes of removal that the putative class is likely more than 100." Id.

argues that, because Plaintiff's "hourly rate of pay was $32.00" and Defendant fails to provide any information explaining the discrepancy, Defendant's assumed hourly rate is unreasonable. Dkt. 12 at 17. Plaintiff additionally argues Ms. Flower's declaration fails to disclose "the number of putative class members on which she relied for the calculation, or how the average was calculated, even by presenting a range of rates or changes in such rates" during the Class Period. Dkt. 20 at 9-10.

Contrary to Plaintiff's assertion, Ms. Flower states in her declaration she reviewed non-exempt California employee records from August 2019 to October 2023 before producing her estimated Average Hourly Wage calculation. Dkts. 1-15 ¶ 4, 12-9 ¶ 4. Plaintiff also fails to specifically identify any basis to question the credibility or reliability of Ms. Flower's conclusion. See dkts. 12 at 13-23, 20 at 9-10. In addition, Plaintiff does not provide any information or reason that would warrant applying Plaintiff's wage rate ($32.00) to the entire putative class, rather than Ms. Flower's estimated Average Hourly Wage for all non-exempt California employees from August 2019 to October 2023. Id. Accordingly, the Court accepts Ms. Flower's conclusion, based on her review of Defendant's payroll records, as credible and finds Defendant's reliance on the Average Hourly Wage of $36.29 to be reasonable.

### b. Unpaid Overtime Wages

With respect to Unpaid Overtime Wages, Defendant assumes a 100% violation rate based on Plaintiff's allegation that the AWS was invalid. Dkt. 18 at 14-15. Plaintiff proposes a 50% violation rate. Dkt. 12 at 20. As discussed below, the Court finds Defendant's proposed 100% violation rate is reasonable.

Plaintiff alleges Defendant adopted "an unlawful AWS" that was "not properly elected and/or implemented in accordance with the requirements of California law[.]" Dkt. 1-1 at 14. According to Defendant, "[i]f Plaintiff prevailed in establishing that the AWS was not properly implemented or elected, it would render the entire AWS null and void for the entire class period." Dkt. 18 at 15. Defendant further argues "[b]y attacking the validity of the election, Plaintiff *necessarily* claims that any person who worked 10-hour shifts on a 4-day/10-hour schedule, was not paid overtime premiums for at least two hours of overtime each day." Id. (emphasis in original). Based on Ms. Flower's calculation, there were 54,684 AWS days (i.e. Class Members who worked 4-day/10-hour shifts). Dkt. 18-1 ¶ 7. Thus, if the AWS policy was deemed invalid, it is reasonable for Defendant to assume Defendant would be required to pay two hours of overtime for all of those AWS days. Dkt. 18 at 15; dkt. 1 at 11 (citing Cal. Lab. Code § 510); dkt. 18-1 ¶ 96.

Accordingly, the Court finds it is reasonable for Defendant to apply a 100% violation rate – based on its theory that if Plaintiff prevailed on its AWS claim, the entire AWS would be null and void. See dkt. 18 at 15. Applying a 100% violation rate and an Average Hourly Wage of $36.29, the Amount in Controversy for the Unpaid Overtime Wages is $1,984,482.[2] Id. at 16, 24.

### c. Meal Period Violations

---

[2] 0.50 (overtime premium) x 54,684 (AWS days) x 36.29 (Average Hourly Rate) x 2 (hours of overtime per AWS day) = $1,984,482

Dkt. 18 at 16.

---

With respect to Meal Period Violations, Defendant assumes a 100% violation rate based on Plaintiff's allegation that Class Members "consistently worked shifts of at least five and one-half hours or more" and were not given their required meal periods.  Dkt. 18 at 16-17; dkt. 1-1 ¶ 45. Plaintiff argues a 20% violation rate is reasonable because the Complaint qualifies the meal break violations as occurring "often" or "at times."  Dkt. 20 at 11.

While Defendant seeks a 100% violation rate, Defendant has acknowledged that even under Plaintiff's proposed conservative 20% violation rate, the Amount in Controversy still is met.  See Dkt. 18 at 16-17.  A 20% violation rate based on Plaintiff's allegations is a conservative amount.[3] See Feltzs v. Cox Commc'ns Cal., LLC, No. 19-2002-JVS-JDEx, 2020 WL 133687, at *4 (C.D. Cal. Jan. 13, 2020) (finding allegations of "consistently" violating meal periods were sufficient to support a 100% violation rate).

 Nonetheless, the Court finds Defendant's conservative Amount in Controversy for meal periods using Defendant's Average Hourly Rate of $36.29 with Plaintiff's proffered 20% violation rate is reasonable.  This produces an Amount in Controversy for Meal Period Violations of $524,194.[4]  Dkt. 18 at 22-23, 24.

### d.        Rest Period Violations

With respect to Rest Period Violations, Defendant assumes a 100% violation rate based on Plaintiff's claims that Class Members "did not receive legally compliant, timely 10-minute rest periods for every four (4) hours worked or major fraction thereof" and additionally that "any purported rest periods were late, interrupted, cut short, [or] on duty[.]"  Dkt. 18 at 17-18; dkt. 1-1 ¶ 116.  Plaintiff argues the allegations do not support a 100% violation rate and instead contends a 20% violation rate is reasonable.  Dkt. 20 at 11-12.

Here, the allegations in the Complaint claiming class members "did not receive legally compliant first, second, or third rest periods as required by California Law" suggest a violation rate greater than Plaintiff's proposed 20% violation rate.[5]  Dkt. 1-1 ¶ 118.  Nonetheless, Defendant has acknowledged that even under Plaintiff's proposed conservative 20% violation rate, the Amount in Controversy still is met.  See dkt. 18 at 17-18.

---

[3] The allegations in the Complaint referring to consistent violations are sufficient to support a violation rate higher than Plaintiff's proffered 20%.  Applying a violation rate of even 40% based on Plaintiff's allegations in the Complaint would double the Amount in Controversy for Meal Period Violations to $1,048,388.

[4] 72,223 (workdays with shifts greater than five hours) x 36.29 (Average Hourly Rate) x 1 (hour premium/day) x .20 (violation rate) = $524,194

Dkt. 18 at 22-23.

[5] Applying a violation rate of even 40% based on Plaintiff's allegations in the Complaint would double the Amount in Controversy for Rest Period Violations to $1,048,388.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk NP

Hence, for purposes of calculating the Amount in Controversy at this stage, the Court finds Defendant's conservative Amount in Controversy for Rest Period Violations using Defendant's Average Hourly Rate of $36.29 with Plaintiff's proffered 20% violation rate is reasonable. Accordingly, the Amount in Controversy for Rest Period Violations is $524,194.[6]  Id. at 23, 24.

### e.      Waiting Time Penalties

With respect to Waiting Time Penalties, Defendant proposes a 100% violation rate.  Dkt. 18 at 18.  Plaintiff originally objected to Defendant's waiting time penalty calculation arguing Defendant failed to show that "all 45 terminated employees were members of the putative Waiting Time subclass or that every terminated employee is entitled to 30 days' worth of penalties."  Dkt. 12 at 22. However, after apparently having reviewed Ms. Flower's Supplemental Declaration, Plaintiff appears to no longer object to Defendant's proposed 100% violation.  Dkt. 20 at 12 ("Defendant fails to offer any evidence in support of the average hourly rate for this discrete group . . . and explain why Defendant uses the 'median daily shift length' rather than the average.  Accordingly though Plaintiff believes that this estimate should be disregarded as unreasonably conclusory, Plaintiff calculates penalties based on his own hourly rate . . . .").

Accordingly, Defendant's proffered Amount in Controversy for Waiting Time Penalties, based on Ms. Flower's data and an average hour rate of $36.29, is reasonable.  The Amount in Controversy for waiting time penalties is $1,110,909.[7]  Dkt. 18 at 23, 24.

### f.      Attorney's Fees

Attorney's fees must be included in the Amount in Controversy calculation.  Fritsch v. Swift Transp. Co. of Arizona, LLC, 899 F.3d 785, 794 (9th Cir. 2018) ("Because the law entitles Fritsch to an award of attorneys' fees if he is successful, such future attorneys' fees are at stake in the litigation, and must be included in the amount in controversy.").

Defendant includes a 25% attorney fee recovery in its Amount in Controversy calculation. Dkt. 1 at 14-15.  Plaintiff appears to object to the 25% rate because it is not based on any "argument or analysis."  Dkt. 12 at 23.

---

[6] 72,223 (workdays with shifts greater than five hours) x 36.29 (Average Hourly Rate) x 1 (hour premium/day) x .20 (violation rate) = $524,194

Dkt. 18 at 23.

[7] [36.29 (Average Hourly Rate) x 10 (hours/day) x 95 (AWS employees that separated from the company) x 8 (hours/day) x 30 (penalty days)]

+

[36.29 (Average Hourly Rate) x 8 (hours/day) x 44 (non-AWS employees that separated from the company) x 30 (penalty days)] x .20 (violation rate)

= $1,110,909

Because "[a] 25% fee recovery is the 'benchmark' level for reasonable attorneys' fees in class action cases," Ramirez v. HV Glob. Mgmt. Corp., No. 21-CV-09955-BLF, 2022 WL 1210402, at *8 (N.D. Cal. Apr. 25, 2022) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998)), the Court finds Defendant's reliance on a 25% attorney fee recovery is reasonable. A 25% attorney fee recovery produces an Amount in Controversy of $1,035,945.[8] Dkt. 18 at 23-24.

* * *

Ultimately, Defendant's alternative conservative Amount in Controversy calculation is reasonable. Based on this calculation, the Court concludes it is reasonable to find: $1,984,482 for Unpaid Overtime Wages, $524,194 for Meal Period Violations, $524,194 for Rest Period Violations, $1,110,909 for Waiting Time Penalties, and $1,035,945 for Attorney's Fees. Accordingly, Defendant has met its burden to show the Amount in Controversy, calculated at $5,179,726, exceeds $5,000,000. See dkt. 18 at 24.

## IV.
## CONCLUSION

For the foregoing reasons, the Court finds Defendant has met its burden to prove that removal in this case is proper. Accordingly, the Court DENIES Plaintiff's Motion to Remand.

**IT IS SO ORDERED.**

---

[8] Applying a 40% violation rate for the Meal and Rest Period Violations would also increase the attorney fee recovery. The current total is calculated as: [$1,984,482 (Unpaid Overtime Wages) + $524,194 (Meal Period Violations) + $524,194 (Rest Period Violations) + $1,110,909 (Waiting Time Penalties)] x .25 (Attorney Fee Recovery Rate) = $1,035,945.